Roger M. Schrimp (SBN 39379)
rschrimp@damrell.com
Clinton P. Walker (SBN 151560)
cwalker@damrell.com
DAMRELL, NELSON, SCHRIMP,
  PALLIOS, PACHER & SILVA
1601 I Street, Fifth Floor
Modesto, CA 95354
Telephone:    (209) 526-3500
Facsimile:    (209) 526-3534

W. Joseph Bruckner
  wjbruckner@locklaw.com
Elizabeth R. Odette
  erodette@locklaw.com
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

*Counsel for Plaintiff and the Proposed Direct*
*Purchaser Class; Additional Counsel on*
*Signature Page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

L.E. HOOVER CO., on behalf of itself and others similarly situated;

        Plaintiff,

        vs.

SONY OPTIARC, INC.; SONY OPTIARC
AMERICA INC.; SONY NEC OPTIARC INC.;
SONY CORP.; TOSHIBA SAMSUNG STORAGE
TECHNOLOGY CORP.; TOSHIBA CORP.;
SAMSUNG ELECTRONICS CO.; HITACHI-LG
DATA STORAGE INC.; HITACHI LTD.; and LG
ELECTRONICS INC.;

        Defendants.

CASE NO.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## I.    INTRODUCTION

1.      Plaintiff L.E. Hoover Co. ("Plaintiff") brings this action on behalf of itself individually and a plaintiff class (the "Class") consisting of all persons and entities who purchased optical disc drives ("ODDs") and products containing them (referred to collectively as "ODD Products") in the United States directly from one or more named defendants between

417023.1

1 November 1, 2005 and the present (the "Class Period").

2     2.     The ODDs that are the subject of this lawsuit include the following formats for
3 use in notebook and desktop computers: CD-ROMS ("CD"), CD-recordable/rewritable ("CD-
4 R/RW"), DVD-ROM ("DVD"), DVD-recordable/rewritable ("DVD±R/RW"), Blu-Ray ("BD"),
5 Blu-Ray-recordable/rewritable ("BD-R"/"BD-RE") and HD-DVD. During the Class Period,
6 ODDs served as one of the primary means for recording and reading music, movies, and other
7 digital data. During this time, defendants' sales of ODDs generated billions of dollars in annual
8 revenues and exponentially expanded with the increased utilization of computers in households
9 and businesses throughout the United States. Nearly every computer that is used or sold in the
10 United States today is equipped with an ODD.

11     3.     Plaintiff is informed and believes, and thereon alleges, that in order to maintain
12 price stability and increase profitability in the ODD market, defendants conspired, combined, and
13 contracted to fix, raise, maintain, and stabilize the price at which ODD Products were sold in the
14 United States. Plaintiff is further informed and believes, and thereon alleges, that defendants
15 fraudulently concealed their anticompetitive conduct from plaintiff and the Class in furtherance
16 of the conspiracy. As a result of defendants' unlawful conduct, plaintiff and the other members
17 of the Class paid artificially inflated prices for ODD Products during the Class Period. Such
18 prices exceeded the amount they would have paid if the price for ODD Products had been
19 determined by a competitive market.

20         **II.**     **JURISDICTION AND VENUE**

21     4.     Plaintiff brings this action to obtain injunctive relief and to recover damages,
22 including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants'
23 violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

24     5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,
25 1337(a) and 1367.

26     6.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and
27 28 U.S.C. § 1391(b), (c), and (d) in that at least one of the defendants resides in this judicial
28 district, is licensed to do business or is doing business in this judicial district.

417023.1

2

1

### III.   PARTIES

2 **A.   Plaintiff**

3       7.       Plaintiff L.E. Hoover Co. is a company with its principal place of business at 19
4 Maple Street, Frewsburg, NY.  Plaintiff purchased ODD Products directly from one or more
5 defendants during the Class Period, and has suffered antitrust injury to its business or property as
6 a result of the actions alleged in this Complaint.

7 **B.   Defendants**

8       8.       Defendant Sony Optiarc America, Inc. ("SOA") is a wholly owned subsidiary of
9 defendant Sony Optiarc, Inc.  Defendant SOA is a Delaware corporation with its business
10 headquarters at 1730 N. 1st Street, San Jose, California 95112.  During the Class Period, SOA
11 manufactured, sold, and distributed ODD Products throughout the United States, directly or
12 through its subsidiaries or affiliates.

13       9.       Defendant Sony Optiarc, Inc. ("SOI") is a Japanese company with its headquarters
14 at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Prior to its formation in 2008,
15 defendant SOI was a joint venture between defendants Sony Corp. and NEC Corp. called Sony
16 NEC Optiarc, Inc.  On September 11, 2008, Sony Corp. purchased NEC Corp.'s interest in Sony
17 NEC Optiarc, Inc.  The company was subsequently renamed SOI.  In 2008, SOI reported
18 revenues of $1.52 billion.  During the Class Period, SOI manufactured, sold, and distributed
19 ODD Products throughout the United States, directly or through its subsidiaries or affiliates.

20       10.      Defendant Sony NEC Optiarc, Inc. ("SNOI") was a Japanese company with its
21 headquarters at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Defendant SNOI was
22 created on April 3, 2006 as a joint venture between defendants Sony Corp. and NEC Corp. in
23 which Sony Corp. had a 55% interest and NEC Corp. had a 45% interest.  Sony Corp. purchased
24 NEC Corp.'s interest in SNOI in 2008 and renamed it Sony Optiarc, Inc.  During the Class
25 Period, SNOI manufactured, sold, and distributed ODD Products throughout the United States,
26 directly or through its subsidiaries or affiliates.  Sony Corp. and NEC Corp. exercised joint
27 control over SNOI.

28       11.      Defendant Sony Corp. ("Sony") is a Japanese company with its principal place of

417023.1
3

business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. During the Class Period, Sony manufactured, sold, and distributed ODD Products throughout the United States, directly or through its subsidiaries or affiliates.

12.    Defendant Toshiba Samsung Storage Technology Corp. ("TSST") is a joint venture of defendants Toshiba Corp. and Samsung Electronics Co. that was established on April 1, 2004. Toshiba owns 51% of the stock in TSST, while Samsung owns the remaining 49%. TSST and Toshiba share corporate headquarters, which are located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period, TSST manufactured, sold, and distributed ODD Products throughout the United States, directly or through its subsidiaries or affiliates. Toshiba Corp. and Samsung Electronics Co. jointly control TSST. TSST forecasted revenue of Y250 billion in fiscal 2004, when it was established.

13.    Defendant Toshiba Corp. ("Toshiba") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period, Toshiba manufactured, sold, and distributed ODD Products throughout the United States, directly or through its subsidiaries or affiliates.

14.    Defendant Samsung Electronics Co., Ltd. ("Samsung") is a Korean company with its principal place of business at Samsung Main Building, 250, Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea. During the Class Period, Samsung manufactured, sold, and distributed ODD Products throughout the United States, directly or through its subsidiaries or affiliates.

15.    Hitachi-LG Data Storage ("HLDS") is a joint venture between defendants Hitachi, Ltd. and LG Electronics, Inc., with its corporate headquarters at 4F MSC Center Bldg., 22-23, Kaigan 3-chome, Minato-Ku, Tokyo 108-0022, Japan. Hitachi, Ltd. owns 51% of the stock in HLDS, while LG Electronics, Inc. owns the remaining 49%. Hitachi, Ltd. and LG Electronics, Inc. jointly control and direct the operations of HLDS. HLDS was established in November 2000 and started operation in January 2001. Between 2001 and 2005 HLDS sold over 170 million optical disc drives, generating approximately $5.5 billion in total revenues. During the Class Period, HLDS manufactured, sold, and distributed ODD Products throughout the United States, directly or through its subsidiaries or affiliates.

4

16.     Defendant Hitachi, Ltd. ("Hitachi") is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan. During the Class Period, Hitachi manufactured, sold, and distributed ODD Products throughout the United States, directly or through its subsidiaries or affiliates.

17.     Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721. During the Class Period, LG Electronics manufactured, sold, and distributed ODD Products throughout the United States, directly or through its subsidiaries or affiliates.

## IV.     AGENTS AND CO-CONSPIRATORS

18.     Other persons, firms and corporations, not named herein as defendants, have participated as co-conspirators with the defendants and have performed acts and made statements in furtherance of the conspiracy. Some of these firms are as yet unidentified. Plaintiff believes that these co-conspirators include NEC Corp., Lite-On IT Corporation ("Lite-On"), Koninklijke Philips Electronics N.V. ("Philips N.V.") and Lite-On's and Philips N.V.'s joint venture that makes ODD products, Philips & Lite-On Digital Solutions Corporation, and its United States subsidiary, Philips & Lite-On Digital Solutions USA, Inc.

19.     The acts alleged against the defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses or affairs.

20.     Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by plaintiff.

21.     Whenever this Complaint refers to an act, deed or transaction of a corporation or entity, the Complaint is alleging that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## V.     CLASS ACTION ALLEGATIONS

1  22.    Plaintiff brings this action both on behalf of itself, and as a class action pursuant

2  to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following Class:

3  All persons and entities who purchased ODD Products in the United
   States directly from one or more defendants between November 1, 2005
4  and the present.  Excluded from the Class are defendants, their parent
   companies, subsidiaries and affiliates, all governmental entities, and any
5  judges or justices assigned to hear any aspect of this action.

6  23.    Plaintiff does not know the exact number of Class members because such

7  information is in the exclusive control of defendants.  Plaintiff believes that, due to the nature of

8  the trade and commerce involved, there are most likely many thousands of Class members,

9  geographically dispersed throughout the United States such that joinder of all Class members is

10 impracticable.

11 24.    Plaintiff's claims are typical of the claims of the Class in that plaintiff is a direct

12 purchaser of ODD Products, all Class members were damaged by the same wrongful conduct of

13 defendants and their co-conspirators as alleged herein, and the relief sought is common to the

14 Class.

15 25.    Numerous questions of law or fact arise from defendants' anticompetitive

16 conduct that are common to the Class, including but not limited to:

17         a.    Whether defendants combined or conspired to fix, raise, maintain, or
18               stabilize prices of ODD Products sold in the United States;

19         b.    Whether defendants combined or conspired to restrict output of ODD
20               Products sold in the United States;

21         c.    Whether defendants' conduct caused the prices of ODD Products sold in
22               the United States to be at artificially high and noncompetitive levels;

23         d.    Whether plaintiff and the other members of the Class were injured by
24               defendants' conduct, and, if so, the appropriate class-wide measure of
25               damages for Class members; and

26         e.    Whether plaintiff and the other members of the Class are entitled to,
27               among other things, injunctive relief, and if so, the nature and extent of
28               such injunctive relief.

26.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

27.     Plaintiff will fairly and adequately represent the interests of the Class in that plaintiff is a direct purchaser of ODD Products and has no conflict with any other members of the Class.   Furthermore, plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

28.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

29.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.   Prosecution as a class action will eliminate the possibility of repetitive litigation.   There will be no material difficulty in the management of this action as a class action.

30.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

31.     Injunctive relief is appropriate as to the Class as a whole because defendants have acted or refused to act on grounds generally applicable to the Class.

32.     Plaintiff reserves the right to expand, modify or alter the Class definition in response to information learned during discovery.

## VI.     TRADE AND COMMERCE

33.     During the Class Period, each defendant, or one or more of its subsidiaries, sold ODD Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

34.     The business activities of the defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

35.     In 2008 Samsung estimated that the ODD market for personal computers was 313 million units per year and the ODD market for all other applications (*e.g.*, automotive audio and video, personal video recorders, set top boxes, CD/ DVD players and recorders, camcorders, and

417023.1

7

1   game consoles) was 200 million units per year.

2                          VII.    **FACTUAL ALLEGATIONS**

3   **A.   Optical Disc Drive Technology and Industry Background**

4          36.     Optical discs contain microscopic pits where data are stored.  These pits are made

5   from a crystalline metal alloy and are usually pressed into the disc in a spiral arrangement,

6   starting at the center of the disc.  Once a disc containing information is inserted into the ODD,

7   the disc spins while a lens inside the device guides a semiconductor laser beam over the disc and

8   a photodiode detects the light reflected from the disc's bumps and pits.  The laser moves outward

9   from the center of the disc, scanning over the disc's surface.  Then the photodiode reads the

10  light's reflection as a binary code (a series of ones and zeros) that the computer translates into

11  usable data.  Changes in the intensity of the beams as the lasers hit the pits are detected and

12  translated into electrical signals.  The more pits that can be packed onto the disc, the more data

13  the disc can store.  The pits are approximately 0.8 micrometers on CDs, 0.4 micrometers on

14  DVDs, and 0.15 micrometers on BDs.  Reading the different disc formats requires the ODD to

15  have lasers of different wavelengths.  Blu-ray disc players use a shorter wavelength laser, which

16  is blue-violet, to read discs.  Additional layers can be added to the disc as well, increasing storage

17  capacity.  In addition to reading discs, ODDs can write and rewrite on the disc, depending on the

18  technology of the drive and accompanying disc.

19         37.     When a recordable disc (*e.g.*, CD-R, DVD-R or BD-R) is inserted into an ODD

20  that has the ability to record data, the ODD's laser is used to selectively heat parts of the organic

21  photosensitive dye layer.  By exposing the disc to light with the laser, the reflective properties of

22  the disc's surface change, which causes the photodiode to recognize these changes as bumps and

23  pits and read the new information on the disc.

24         38.     ODDs include half-height and slim models.  Half height ODDs are thicker and

25  generally incorporated into desktop computer towers.  Slim ODDs are thinner and generally

26  incorporated into laptop computers.  As laptop computers have become more popular with

27  consumers, demand for slim optical disc drives has increased and is expected to overtake half-

28  height demand over the next five years.

                                              8

39.     Table 1 provides an overview of the names, sizes and capabilities of the main, available ODD standards.  Notwithstanding variables in data access speeds and writing speeds, all ODDs possess the same core technology.   ODDs built more recently are "backwards compatible" such that ODDs with the latest technology can still read first generation CD-ROMs. DVD rewritable drives have been the mainstream ODD for computers since 2006.

| Table 1: Overview of Optical Disc Drive Standards | | |
|---|---|---|
| Drive Standard | Capacity [a] | Capability |
| CD-ROM | 700 MB | Read Only |
| CD-R | 700 MB | Read, Write |
| CD-RW | 700 MB | Read, Write, Rewritable |
| DVD-ROM | 4.7 GB | Read Only |
| DVD-RAM | 4.7 GB | Read, Write |
| DVD-R [b] | 4.7 GB | Read, Write |
| DVD-RW [b] | 4.7 GB | Read, Write, Rewritable |
| BD-ROM | 25 GB Single Layer; 50 GB Dual Layer | Read Only |
| BD-R | 25 GB Single Layer; 50 GB Dual Layer | Read, Write |
| BD-RE | 25 GB Single Layer; 50 GB Dual Layer | Read, Write, Rewritable |

[a] These are standard capacities. Depending on the number of layers, or if the disc can be read double-sided, the capacity will be larger.

[b] There are other DVD standards such as DVD+R/RW, which include other features or improvements- see http://www.videohelp.com/dvd.

Source: See http://www.videohelp.com/dvd and http://www.tech-faq.com/blu-ray.shtml.

40.     The first ODD was invented with the creation of the audio compact disc (audio "CD"), which was jointly invented by Sony and Philips Electronics ("Philips").  In 1972, Philips announced a technique for storing audio recordings on an optical disc with a small diameter.  At the same time, Sony was exploring optically recording audio on a larger disc but was focusing on developing an error correction technique.  In 1978, Sony and Philips agreed on a single format

1  for the disc and the error correction method that would be used. The compact disc system was

2  introduced to the public in Japan and Europe in 1982. Since the 1980s, several companies have

3  created spin-offs of the CD project by covering specific CD-based applications and extending the

4  previously established standards set by Sony and Philips.

5      41.     Once the standard of how to create a CD and an optical device that reads the

6  information on the CD were established, CD-ROM drives began to penetrate the computer

7  market. Optical disc drives have been in common use in computers since the 1990s, when CD-

8  ROM drives became affordable for the average consumer. Thereafter, manufacturers developed

9  optical disc drives for computers that could read and write DVDs and Blu-Ray discs, which can

10  hold more data than a CD-ROM.

11      42.     Today, ODDs are a standard component on almost every computer used in the

12  United States. Due to the increasing popularity of personal computers, hundreds of millions of

13  ODDs and ODD Products are shipped by defendants each year, generating billions of dollars in

14  annual revenues. According to an IDC analysis, between 2004 and 2008 worldwide ODD

15  shipments generated over $45 billion in revenues. As seen below, Digitimes research estimates

16  that worldwide ODD shipments increased at an annual rate of approximately 10%, exceeding 300

17  million by 2007.

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12



13

**B.    Characteristics of the ODD Products Industry Made it Ripe for Collusion**

14

15

16

43.    The ODD Products industry has several characteristics that facilitate a conspiracy, including market concentration, ease of information sharing, multiple interrelated business relationships, significant barriers to entry, and homogeneity of products.

17

i.    **The ODD Market Is Highly Concentrated.**

18

19

20

21

22

23

24

25

26

44.    During the Class Period, the ODD industry has been dominated by relatively few companies, including defendants. During the Class Period, defendant HLDS, which is a joint venture between defendants Hitachi and LG Electronics, established itself as the industry's top manufacturer with overall annual market share of between 25% and 30% of shipments. TSST, a joint venture formed in 2004 by defendants Toshiba and Samsung, is the second largest optical disc drive manufacturer in the world with an annual market share in excess of 20%. In 2008, defendants HLDS, TSST, and SOI were among the largest producers of ODDs in the world, with a combined market share of 67%. Defendants' dominance and control over the ODD market facilitated their ability to implement their conspiracy to fix the price of ODD Products.

27

ii.    **Defendants Pursued Joint Ventures and Other Coordinated Activities.**

28

45.     Defendants were also involved and relied upon joint ventures and long standing business relationships in the ODD market which gave them continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information.   As noted above, the first of these joint ventures was HLDS, which was established as a joint venture between defendants Hitachi and LG Electronics in November of 2000 and started operation in January 2001.   In April 2004, defendants Toshiba and Samsung consolidated their optical disc drive divisions to form TSST.   Approximately two years later, Sony and NEC Corporation entered into an optical disc drive joint venture to form SNOI.

46.     These joint ventures not only facilitated information exchanges among the defendants, their very formations resulted from such information exchanges, and constitute evidence of an ongoing antitrust conspiracy among defendants.   Furthermore, the mutually beneficial nature of the business relations between certain defendants provided the opportunity to conspire and created a financial incentive to do so.   As one Sony spokesman explained when announcing the formation of SNOI, the joint venture came into existence because: **"*There was a feeling that those two complementary strengths [Sony and NEC] would make more sense in a joint venture than competing against each other.*"** (Emphasis added.)

### iii.   There Are High Barriers to Entry Into the ODD Industry.

47.     There are significant manufacturing and technological barriers to entry into the ODD industry.   In order to compete in the ODD industry, companies have to spend hundreds of millions of dollars in research and development, licensing, and manufacturing of products. Moreover, the ownership and control exerted by defendants over ODD Product technology and market share has allowed defendants to dictate who enters the market and at what cost.   These barriers to entry have made it extremely difficult for smaller manufacturers of ODD Products to compete with defendants and overcome the effects of economies of scale.   Accordingly, the financial structure of the ODD industry allowed defendants to implement their antitrust conspiracy by eliminating competition and artificially stabilizing the prices of ODD Products without losing market share.

### iv.   Defendants Are Active in Trade and Business Organizations.

48.     During the Class Period, defendants belonged to trade and business organizations that focused on ODD Products and related industries, such as the DVD Forum, the Optical Storage Technology Association ("OSTA"), and the International Symposium of Optical Memory ("ISOM"). The DVD Forum, which includes defendants Hitachi, LG Electronics, Samsung, Sony, and Toshiba as members of its steering committee, is an organization responsible for the licensing and distribution of DVD products whose "purpose is to exchange and disseminate ideas and information about the DVD Format and its technical capabilities, improvements and innovations." OSTA's members include LG Electronics and Sony. As explained on its website, OSTA was:

> incorporated as an international trade association in 1992 to promote the use of writable optical technologies and products for storage of computer data. The organization's membership includes optical product manufacturers and resellers from three continents, representing more than 85 percent of worldwide writable optical product shipments. They work to shape the future of the industry through regular meetings of CD/DVD, file interchange, market development, magneto-optical and planning committees.

49.     During the Class Period, these organizations held multiple meetings and conferences attended by defendants and their employees, which provided defendants with the opportunity to meet, discuss, and agree upon their pricing of ODD Products.

### v.     ODD Products Are Standardized.

50.     Since its inception in the 1970s, the ODD industry has been typified by standardization of discs (*e.g.*, CD-ROMs, DVD-ROMs) and ODD Products driven by industry participants and a variety of industry-related organizations such as ECMA International, the International Standardization Organization ("ISO"), and International Electrotechnical Commission ("IEC"). These organizations and their members are dedicated to "standardizing the use of information communication technology and consumer electronics."

51.     The ODD industry is also subject to patents and intellectual property rights which require adoption of standardized product specifications. Philips Consumer Electronics B.V., which is responsible for the development of CD technology and continues to hold patents and licensing rights arising therefrom, has stated the following:

13

Standardization offers many other advantages to industry as a whole. For example: [1] Improvements to performance, compatibility, reliability, safety and interoperability; [2] Economies of scale and lower costs – for example, by allowing manufacturers to address multiple regions with a single product or manufacturing line; and [3] *Cooperation between industry leaders, reducing the risk for 'first-mover' companies which pioneer new products or technologies*. (Emphasis added.)

52. The standardization of the ODD Products industry provided defendants with the mechanism to implement, enforce, and oversee their anticompetitive conspiracy to fix the price of ODD Products. Furthermore, as a result of this standardization, ODD Products are commodity products, and buyers make decisions to purchase such products based largely, if not exclusively, on price.

## C. Collusion on Prices for ODD Products

53. Plaintiff is informed and believes, and thereon alleges, that faced with shrinking profits from ODD Products, defendants conspired to fix, raise, maintain, and stabilize the price of ODD Products in the United States at artificially inflated and anticompetitive levels in order to preserve and increase their revenues.

54. Defendants have been the subject of government investigations for their cartel activity in recent years. For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the United States Department of Justice ("DOJ") into price-fixing of dynamic random access memory ("DRAM") computer chips. The DOJ is currently investigating Samsung, LG Electronics, Toshiba, and Hitachi, among others, concerning collusion among manufacturers of thin film transistor liquid crystal display ("TFT-LCDs"). The ongoing TFT-LCD criminal investigation has resulted in hundreds of millions of dollars in criminal penalties and admissions of guilt by LG Electronics ($400 million in fines) and Hitachi ($31 million in fines).

55. These same companies have been under investigation in the European Union ("EU"). The entities mentioned in the preceding paragraph are all under investigation for colluding to fix prices on TFT-LCDs sold in Europe. And in November 2007, the EU fined, *inter alia*, Sony and various related entities and the Hitachi Maxell Limited joint venture $110 million

417023.1

1  for fixing the prices of professional videotapes sold in Europe between 1999 and 2002. Similarly,

2  Hitachi and Toshiba were fined by the European Commission for their roles in a conspiracy to

3  control prices and allocate market shares in the market for gas-insulated switchgear between

4  1988 and 2004.

5      56.    Plaintiff is informed and believes, and thereon alleges, that defendants are

6  currently under investigation by the DOJ for anticompetitive conduct in connection with the

7  ODD industry. Plaintiff is further informed and believes, and thereon alleges, that the United

8  States' criminal investigation of the ODD conspiracy is being conducted by the DOJ's Antitrust

9  Division in the Northern District of California.

10      57.    On October 23, 2009, Sony Corporation disclosed the following in a Form 6-K it

11  filed with the SEC:

12  
13          Sony Corporation said today that its U.S. subsidiary, Sony Optiarc
America Inc., has received a subpoena from the U.S. Department of
Justice (DOJ) Antitrust Division seeking information about its optical disk

14          drive business. Sony understands that the DOJ and agencies outside the
United States are investigating competition in optical disk drives.

15  

16      58.    On October 26, 2009, defendants SOA, TSST and HLDS confirmed that they

17  received subpoenas from the DOJ in connection with a criminal antitrust investigation into

18  possible price-fixing, bid-rigging, and allocation of markets regarding ODDs. News reports

19  indicated that EU and Singaporean antitrust authorities were conducting similar investigations.

20      59.    On October 27, 2009, United States DOJ spokeswoman, Gina Talamona

21  confirmed that the antitrust division is investigating the possibility of anticompetitive practices in

22  the optical disc drive industry.

23      60.    It is significant that defendants' anticompetitive behavior has been the subject of

24  a criminal grand jury investigation by the DOJ. In order for the DOJ to institute a grand jury

25  investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed

26  and prepare a detailed memorandum to that effect. *See* Antitrust Grand Jury Practice Manual,

27  Vol. 1, Ch. I.B.1 ("[i]f a Division attorney believes that a criminal violation of the antitrust laws

28  has occurred, he should prepare a memorandum requesting authority to conduct a grand jury

417023.1

15

investigation.")  Furthermore, following a review of the memorandum, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred. *See id.*  In addition, the fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant as well.    The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations." *See* Antitrust Division Manual, Chapter III.C.5.  Accordingly, the existence of a criminal investigation into the ODD industry supports the existence of the conspiracy alleged herein.

**D.    Effects of Defendants' Antitrust Violations**

61.    The above combination and conspiracy has had the following effects, among others:

   a.    Price competition in the sale of ODD Products by defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

   b.    Prices for ODD Products sold by defendants have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

   c.    Direct purchasers of ODD Products from defendants have been deprived of the benefit of free and open competition in the purchase of ODD Products.

62.    As a direct and proximate result of the unlawful conduct of defendants, plaintiff and other members of the Class have been injured in their businesses and property in that they paid more for ODD Products than they otherwise would have paid in the absence of the unlawful conduct of defendants.

**E.    Fraudulent Concealment**

63.    Plaintiff had neither actual nor constructive knowledge of the facts constituting

1 its claim for relief despite diligence in trying to discover the pertinent facts. Plaintiff and
2 members of the Class did not discover, and could not have discovered through the exercise of
3 reasonable diligence, the existence of the conspiracy alleged herein until October 2009 when the
4 antitrust investigation by the DOJ became public. Defendants engaged in a secret conspiracy that
5 did not give rise to facts that would put plaintiff or the Class on inquiry notice that there was a
6 conspiracy to fix prices for ODD Products.

7 64. Accordingly, plaintiff and Class members could not have discovered, and did not
8 discover, despite the exercise of due diligence, the violations alleged herein earlier until shortly
9 before the filing of this Complaint because defendants and their co-conspirators conducted their
10 conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance
11 thereof, and fraudulently concealed their activities through various other means and methods
12 designed to avoid detection.

13 65. Defendants and their co-conspirators engaged in a successful price-fixing
14 conspiracy concerning ODD Products, which they affirmatively concealed, at least in the
15 following respects:

16     a. By meeting face to face secretly to discuss prices, customers and markets
17     of ODD Products sold in the United States and elsewhere;

18     b. By using certain methods of communication to evade detection, such as
19     telephonic conversations to discuss prices, customers and markets of ODD
20     Products sold in the United States and elsewhere;

21     c. By agreeing among themselves at meetings and in communications not to
22     discuss publicly, or otherwise reveal, the nature and substance of the acts
23     and communications in furtherance of their illegal scheme;

24     d. By intentionally creating the false appearance of competition; and

25     e. By giving customers and the public pretextual reasons for pricing changes
26     in ODD Products were materially false and misleading and made for the
27     purpose of concealing defendants' anti-competitive scheme as alleged
28     herein.

417023.1

**1**     66.     As a result of defendants' fraudulent concealment of their conspiracy, the running

**2** of any statute of limitations has been tolled with respect to any claims that plaintiff and the Class

**3** members have as a result of the anticompetitive conduct alleged in this Complaint.

**4**             **VIII.  CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

**5**     67.     Plaintiff incorporates by reference all the above allegations as if fully set forth

**6** herein.

**7**     68.     Beginning at least as early as November 1, 2005, the exact date being unknown

**8** to plaintiff and exclusively within the knowledge of defendants, defendants and their co-

**9** conspirators entered into a continuing contract, combination or conspiracy to unreasonably

**10** restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

**11** artificially reducing or eliminating competition in the United States.

**12**     69.     In particular, defendants have combined and conspired to raise, fix, maintain or

**13** stabilize the prices of ODD Products sold in the United States.

**14**     70.     As a result of defendants' unlawful conduct, prices for ODD Products were

**15** raised, fixed, maintained, and stabilized in the United States.

**16**     71.     The contract, combination or conspiracy among defendants consisted of a

**17** continuing agreement, understanding, and concerted action among defendants and their co-

**18** conspirators.

**19**     72.     For purposes of formulating and effectuating their contract, combination, or

**20** conspiracy, defendants and their co-conspirators did those things they contracted, combined, or

**21** conspired to do, including:

**22**             a.     Participating in meetings and conversations to discuss the prices and

**23**                  supply of ODD Products;

**24**             b.     Communicating in writing and orally to fix prices of ODD Products;

**25**             c.     Agreeing to manipulate prices and supply of ODD Products sold in the

**26**                  United States in a manner that deprived direct purchasers of free and open

**27**                  competition;

**28**             d.     Issuing price announcements and price quotations in accordance with the

1    agreements reached;

2        e.    Selling ODD Products to customers in the United States at non-
3              competitive prices; and

4        f.    Providing false statements to the public to explain increased prices for
5              ODD Products.

6    73.    As a result of defendants' unlawful conduct, plaintiff and the other members of
7    the Class have been injured in their businesses and property in that they have paid more for ODD
8    Products than they otherwise would have paid in the absence of defendants' unlawful conduct.

9                              IX.    **DAMAGES**

10   74.    During the Class Period, plaintiff and the other members of the Class purchased
11   ODD Products directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by
12   reason of the antitrust violations herein alleged, paid more for such products than they would
13   have paid in the absence of such antitrust violations.  As a result, plaintiff and the other members
14   of the Class have sustained damages to their businesses and property in an amount to be
15   determined at trial.

16                           X.    **REQUEST FOR RELIEF**

17   WHEREFORE, plaintiff requests that the Court enter judgment on its behalf and on
18   behalf of the Class herein, adjudging and decreeing that:

19   A.    This action may proceed as a class action, with plaintiff as the designated Class
20   Representative and its counsel as Class Counsel;

21   B.    Defendants have engaged in a contract, combination, and conspiracy in violation of
22   Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiff and the Class have been injured
23   in their businesses and property as a result of defendants' violations;

24   C.    Plaintiff and the members of the Class recover damages sustained by them, as
25   provided by the federal antitrust laws, and that a joint and several judgment in favor of plaintiff
26   and the Class be entered against the defendants in an amount to be trebled in accordance with
27   such laws;

28   D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the

417023.1                          19
                          CLASS ACTION COMPLAINT

1  respective officers, directors, partners, agents, and employees thereof and all other persons acting

2  or claiming to act on their behalf be permanently enjoined and restrained from continuing and

3  maintaining the combination, conspiracy, or agreement alleged herein;

4      E.   Plaintiff and the members of the Class be awarded pre-judgment and post-judgment

5  interest, and that such interest be awarded at the highest legal rate from and after the date of

6  service of the initial complaint in this action;

7      F.   Plaintiff and the members of the Class recover their costs of this suit, including

8  reasonable attorneys' fees as provided by law; and

9      G.   Plaintiff and the members of the Class receive such other or further relief as may be

10  just and proper.

11              **XI.   JURY TRIAL DEMANDED**

12      Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury of all

13  of the claims asserted in this Complaint so triable.

14  DATED: January 19, 2010          By:   _____

15                                    Clinton P. Walker (SBN 151560)
                                      cwalker@damrell.com
16                                    Roger M. Schrimp (SBN 39379)
                                      rschrimp@damrell.com
17                                    DAMRELL, NELSON, SCHRIMP,
                                       PALLIOS, PACHER & SILVA
18                                    1601 I Street, Fifth Floor
                                      Modesto, CA  95354
19                                    Telephone:  (209) 526-3500
                                      Facsimile:  (209) 526-3534

20

21                                    W. Joseph Bruckner
                                       wjbruckner@locklaw.com
22                                    Elizabeth R. Odette
                                       erodette@locklaw.com
23                                    LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                      100 Washington Avenue South, Suite 2200
24                                    Minneapolis, MN  55401
                                      Telephone: (612) 339-6900
25                                    Facsimile: (612) 339-0981

26

27

28

417023.1                      20
                    CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ira Neil Richards
  ira@trrlaw.com
TRUJILLO RODRIGUEZ & RICHARDS,
LLC
1717 Arch Street, Suite 3838
Philadelphia, PA  19103
Telephone:  (215) 731-9004
Facsimile:  (215) 731-9044

Richard L. Creighton, Jr.
  rcreighton@kmklaw.com
KEATING, MUETHING & KLEKAMP
PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Telephone: (513) 579-6513
Facsimile: (513) 579-6457

*Counsel for Plaintiff and the Proposed
Direct Purchaser Class*

417023.1

21

CLASS ACTION COMPLAINT